UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                         ::

UNITED STATES OF AMERICA,            :           03 CR 1368 (ARR)
                                           :
                                           :           <u>NOT FOR</u>
       -against-                    :           <u>PUBLICATION</u>
                                           :

ERROL SMALL, MICHAEL ERSKINE, PRIESTLY   :           <u>OPINION AND ORDER</u>
GREEN, and EGLAN YOUNGE,                :
                                           :
                     Defendants.           :
                                           X
------------------------------------------------------------------

ROSS, United States District Judge:

Defendants Michael Erskine and Errol Small were convicted, on May 12, 2005, of

conspiring to import narcotics into the United States in violation of 21 U.S.C. §§ 952(a) and

963. Erskine was also convicted of conspiring to distribute and possess with intent to

distribute narcotics, in violation of 18 U.S.C. §§ 841(a) and 846. Both defendants now move

for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. Erskine argues that the

government offered proof of multiple, separate conspiracies rather than the single conspiracy

alleged in the indictment, a variance that caused him substantial prejudice. Small argues that

the government failed to present sufficient evidence to support his conviction because it did

not demonstrate beyond a reasonable doubt that he had knowledge that narcotics were being

imported into the United States. For the reasons set forth below, the court denies Erskine and

Small's motions for acquittal.

The court will also address, <u>sua</u> <u>sponte</u>, whether the variance between the single

conspiracy charged in the indictment and the multiple conspiracies proved at trial prejudiced

defendants Small and Priestly Green by leading the jury to find both defendants' offenses to have involved cocaine and marijuana.[1]  For the reasons set forth below, the court finds that these defendants suffered prejudice only to the extent that the jury determined that their offenses involved marijuana and concludes, as a result, that it may not consider this determination in sentencing Green and Small.

## BACKGROUND

The government adduced evidence at trial through which it intended to show a multifaceted conspiracy to import cocaine and marijuana into the United States through John F. Kennedy Airport ("JFK"), and to possess with intent to distribute those narcotics, with Michael Adams as the central organizing figure.  In presenting its case, the government adduced evidence about a number of importation schemes at JFK spanning the last fifteen years, many of which were included within the indictment and many of which were not.  The government explicitly argued that four schemes fell within the scope of the indictment: (1) the importation of cocaine from Guyana on Universal Airways flights; (2) a planned importation of cocaine from Barbados; (3) a scheme involving shipments through the "international to international" ("ITI") section of the Miami airport that would involve the diversion of luggage containing narcotics to JFK; and (4) the importation of marijuana on Air Jamaica Flight 15 that resulted in the October 5, 2003 seizure of seventy-seven kilograms of marijuana.

The Universal Airways Scheme

---

[1]Defendant Eglan Younge was convicted on both conspiracy counts, but the jury determined that his offenses involved only cocaine.  As a result, Younge could not have been prejudiced by any variance.

The scheme that formed the core of the government's case involved shipments of cocaine from a supplier in Guyana on Universal Airways ("Universal") flights. While the narcotics were originally stored in checked luggage, later shipments were packaged on cargo pallets with boxes of fresh fish. The Guyanese supplier involved in these importations was "Persaud." Tyrone Browne acted as the liaison between Persaud and Adams, relaying information about the location of the shipment so that Adams, in turn, could inform the baggage handlers at the airport who would actually offload the airplane. Trial Transcript [hereinafter "Tr."] at 174-75. Browne testified that he had been instrumental in developing this scheme shortly after September 11, 2001, when he learned of Universal's existence and confirmed that Persaud would be able to send shipments on its flights. Id. at 192. Both Browne and Adams were employed at Hudson General ("Hudson") at the time, an independent contractor that offloaded airplanes for various airlines. Id. at 193-94. Hudson did not service Universal flights, however, so neither Browne nor Adams would be able to offload the luggage containing the narcotics. During this time, defendant Priestly Green met Erroldo Weatherly, an employee of Evergreen Eagle ("Evergreen"), the company contracted to offload Universal flights, and discussed whether Weatherly could assist in the offloading of luggage containing narcotics. Id. at 323-25. Adams thereafter contacted Weatherly, who agreed to offload the drugs for Adams with help from other Evergreen employees. Id. at 194-95. Stephenson Watson and Cleveland Green were among Weatherly's usual crew. Defendant Errol Small was a ramp supervisor with Evergreen who oversaw the offloading of Universal flights containing cocaine shipments on several occasions. After offloading a flight, Weatherly would deliver the luggage containing the narcotics to Adams and Selwyn Smith. Smith was an

employee of Flying Foods, a contractor that provided food and beverage service to airlines. Adams and Smith would typically wait off the tarmac in a Flying Foods truck for Weatherly to deliver the drugs, at which point they would leave the airport. Defendant Eglan Younge became directly involved in this scheme, at one point tossing a knapsack containing cocaine to Smith and Adams in the Flying Foods truck and later demanding that he be paid. Id. at 348-49, 538-39.

Younge apparently was also involved in his own, independent scheme, importing cocaine on Universal flights from Guyana via cargo by packing the narcotics on pallets with fresh fish. In the fall of 2003, Adams learned that someone was importing cocaine in the cargo on Universal flights, concealed in fish pallets, and Browne asked Persaud, the Guyanese supplier, what he knew about this method and whether he could ship cocaine in the same way. Id. at 218. Persaud reported that "Roscoe," whom Browne had originally contacted about sending drugs on Universal flights, was sending cocaine on the fish pallets and that he could send a shipment of cocaine on a pallet with Roscoe's shipment. Id. at 218-19. Browne and Adams were expecting a shipment of sixty kilograms of cocaine on a cargo pallet packed in a box marked "JJ" on a September 20, 2003 Universal flight from Guyana. The drugs were seized that day, along with 120 kilograms of cocaine that Roscoe had sent to Younge on the same pallet of fish.

The Barbados Scheme

At some point in 2002, Michael Adams indicated to Tyrone Browne that he had a contact who worked at American Airlines at JFK who had access to a flight from Barbados and would be able to offload luggage containing narcotics. Id. at 206. Browne contacted

Persaud to determine whether he would be able to ship narcotics, presumably cocaine, on flights originating in Barbados.  Id. at 207.  As late as September 4, 2003, Adams called Browne and indicated that his contact at American Airlines had a "buddy pass" for flights coming from Barbados.  Government's Ex. T-36.  Adams spoke with defendant Michael Erskine on September 8, 2003, a Monday, at which point Erskine indicated that he would available until Wednesday.  Government's Ex. T-38.  Approximately three minutes later, Adams telephoned Browne and told him that his contact at American Airlines would be available until Wednesday to receive shipments from Barbados.  Government's Ex. T-39.  The evidence thus showed Erskine to be Adams' contact at American who could offload shipments sent from Barbados.  No shipments were ever made from Barbados, however, because security at the airport there was too restrictive.  Tr. at 207.

The ITI Scheme

The ITI scheme apparently had two dimensions.  Adams and Mark Gauntlett, a friend from school in Jamaica, had discussed importing marijuana from Jamaica to JFK on an American Airlines flight that would stop in Miami.  Id. at 664.  Luggage arriving from overseas that would briefly layover in Miami before continuing to a foreign destination would remain in the ITI section of the airport without being inspected by customs officers.  The plan was that an American Airlines employee with access to the ITI section could divert luggage containing narcotics to a JFK-bound flight without it being inspected.  Defendant Priestly "Money" Green was Adams' contact who had agreed to divert the luggage in Miami.  Id. at 664-65.  Gauntlett had two sources in Jamaica, Richard Oliver and "Don."  Id. at 647.  No shipments from Jamaica were ever attempted via Miami, however.  Id. at 666.

The second aspect of the ITI scheme, the dimension the government argues is included within the conspiracy charged in the indictment, involved shipping narcotics from Panama and Venezuela, a reputed transit country for cocaine shipments. Id. at 1106. Selwyn Smith had been in contact with two suppliers about sending narcotics to JFK via Miami, "Red" and "Estrella," who Adams frequently referred to as "Cancellation" because he often cancelled planned shipments. Id. at 553. Estrella asked Smith whether Adams had any contacts in Miami, and Smith discussed the matter with Adams, understanding that Green could divert the luggage in Miami.[2] Id. On August 29, 2003, Adams and Erskine discussed whether the "Venezuela" had started yet. Government's Ex. T-35. A month later, on September 29, 2003, Adams asked Erskine whether he still had a "buddy pass" for his "aunt from Venezuela." Government's Ex. T-41. Erskine indicated that anything coming from Venezuela would have to go through Miami before coming to JFK.[3] Id. On October 2, 2003, Adams again called Erskine asking whether a "buddy pass" from Panama City would have to use the same ITI, and Erskine confirmed that it would. Government's Ex. T-42. At one point during these conversations about ITI shipments, Adams expressed frustration that his "travel agent" was not getting any "tickets" and that he would have "to go to some other travel agents."

_____

[2]Smith testified at trial that shortly after discussing the ITI scheme with Adams, he told Browne that he no longer wanted to work directly with Adams because Adams did not give him enough money. Tr. at 555. Browne and Smith then devised a scheme to hide narcotics in the ice compartment of beverage carts used to service North American Airlines flights. Id. at 555-56. Persaud supplied the drugs, and Lloyd McKend and Neville Fennell assisted Browne and Smith in offloading the shipments. Id. at 202-03. Adams and Weatherly were not involved in this scheme. Id.

[3]Erskine also indicated that any shipments from Barbados could go directly to JFK without laying over in Miami. Government's Ex. T-41.

Government's Ex. T-41.  The government presented no evidence of any successful ITI shipments.

<u>The Air Jamaica Scheme</u>

The final dimension of the Adams importation conspiracy, as argued by the government, involved the importation of narcotics from Jamaica via Air Jamaica Flight 15. Like the ITI plan, this scheme had two dimensions.  Adams had originally discussed the possibility of importing drugs on this flight with Mark Gauntlett.  Tr. 644-45.  As previously indicated, Gauntlett had two possible sources in Jamaica who could send marijuana, Richard Oliver and "Don."  <u>Id.</u> at 647.  Gauntlett apparently never successfully shipped any marijuana on Flight 15, however.  <u>Id.</u> at 657.

The government argued at trial that at least one shipment on Flight 15 falls squarely within the conspiracy charged in the indictment.  A shipment of seventy-seven kilograms of marijuana was seized from Air Jamaica Flight 15 on October 5, 2003.  Adams and Erskine had discussed an importation on Flight 15 on August 12, 2003.  Government's Ex. T-32.  On August 27, 2003, Erskine gave Adams the telephone number of a contact in Jamaica. Government's Ex. T-33.  Approximately seven minutes later, Adams called "Glen" on the Jamaican telephone number and negotiated a shipment on "the 15 year old," established by other evidence to be Air Jamaica Flight 15.  Government's Ex. T-34.  Adams and Erskine spoke about a pending shipment on October 5, 2003.  Government's Ex. T-45.  Customs seized seventy-seven kilograms of marijuana from Flight 15 at JFK that same day.  Adams left a voice message for Erskine the following day indicating that "those food that we got was eaten."  Government's Ex. T-47.  Two days later, Adams spoke with Erskine, telling him that

7

"the chicken got burned up."  Government's Ex. T-49.  Gladstone Blair, who confirmed to Adams that the drugs had been seized, was also apparently involved in this importation in some capacity.  Government's Ex. T-46.

Summary

As discussed above, the government contends that the conspiracy charged in the indictment has four aspects, which merit summary here.  (1) The evidence adduced at trial established the existence of a core narcotics importation scheme involving Adams.  That scheme involved the importation of cocaine from Guyana on Universal Airways flights, first using luggage and then in cargo shipments, with Persaud as the supplier, Browne operating as liaison, Adams organizing the offloading at JFK, and Weatherly's crew actually offloading the plane.  The evidence indicated that Priestly Green had introduced Weatherly to Adams and that both Errol Small and Eglan Younge had played roles in the scheme.  (2) The second component, the Barbados scheme, was substantially similar to the core scheme.  Persaud was to act as the supplier, Browne was the liaison, and Adams made logistical arrangements at the airport.  Because the drugs were to be imported on American Airlines flights, however, and Evergreen Eagle did not service those flights, Weatherly's crew could not do the offloading.  Adams thus arranged with Erskine, his contact at American Airlines, to do the offloading.  (3) The evidence adduced regarding the third component, the ITI shipments, indicated that Estrella, also known as Cancellation, was to be the supplier.[4]  No evidence adduced at trial indicates that any other supplier was involved in the planned ITI shipments.  Selwyn Smith

_____

[4]As recounted above, Selwyn Smith testified that Cancellation had approached him and asked whether Adams had a contact in Miami who could divert luggage from the ITI section of the airport to JFK.

acted as the initial liaison between Estrella and Adams.  Other evidence indicated that Priestly

Green would divert the luggage in Miami and that Michael Erskine would retrieve it at JFK.

(4) The fourth and final component was the scheme to import marijuana on Air Jamaica Flight

15.  The evidence indicates that Erskine put Adams in contact with "Glen," a Jamaican

supplier of marijuana, and that Gladstone Blair was also involved in some way.

## DISCUSSION

I.  <u>Sufficiency Standard</u>

A defendant seeking to overturn a conviction on the ground that the evidence was

insufficient bears a heavy burden.  <u>United States v. Russo</u>, 74 F.3d 1383, 1395 (2d Cir. 1996).

The court must give deference to the jury's assessment of the credibility of the witnesses and

to its selection among competing inferences.  <u>United States v. Pelaes</u>, 790 F.2d 254, 259 (2d

Cir. 1986).  A conviction challenged on sufficiency grounds will be affirmed if, viewing all the

evidence in the light most favorable to the prosecution and drawing all reasonable inferences

in its favor, a reviewing court finds that "any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S.

307, 319 (1979).

II.  <u>Sufficiency of the Evidence to Sustain Small's Conviction</u>

The evidence against Small is far from overwhelming.  The evidence adduced at trial

comes in four parts: (1) the payment of $400 in "hush money" on June 20, 2003; (2) the

payment of $1000 shortly thereafter; (3) a telephone conversation between Small and Erroldo

Weatherly on September 1, 2003; and (4) testimony that Small sought more money for his

participation in the September 20, 2003 shipment.  The court will address each piece of

evidence in turn, drawing all reasonable inferences in the government's favor and viewing those inferences cumulatively.

First, with respect to the June 20, 2003 payment, Weatherly testified that he was not scheduled to service the Universal flight carrying the shipment of narcotics on that date. Tr. at 347. Small, who was a ramp supervisor at Evergreen Eagle and was in charge of offloading the flight, was apparently curious why Weatherly was working the flight, but he accepted the help. Id. Weatherly had asked Stephenson Watson and Junior Barnett, who apparently were scheduled to work the flight, to "watch his back," but he had not spoken to Small. Id. Weatherly was not sure whether Small saw Younge toss a piece of luggage to Adams in the Flying Foods truck, but he thought that Small had seen him acting a "little fishy," so Weatherly spoke to him, explaining that he had "something small . . . going on." Id. at 349. Weatherly later paid Small $400, telling him that it was "for not saying anything." Id. at 350-51. At trial, Weatherly testified that he had paid Small because "he just accidentally saw something that he wasn't supposed to see . . . he didn't act up or do anything. He just went with the flow, basically." Id. at 447.

The second incident occurred approximately a week and a half later. Id. at 351. Weatherly testified that, after Adams told him about another shipment from Guyana, he told the "regular people," among whom he included Barnett, Watson, Cleveland Green, and Small. Id. at 352. Weatherly testified that he told them "to watch [his] back in case something went sour." Id. Weatherly paid Small $1000 this time so that "there would be no complaints." Id. at 354.

The third piece of evidence is a telephone conversation between Weatherly and Small on September 1, 2003, during the West Indian parade on Eastern Parkway on Labor Day. Adams had called Weatherly at 4:19 p.m. to tell him that he had just heard that a shipment was arriving in the spare tire compartment on a Universal flight.  Government's Ex. T-3. Weatherly explained that he and his group were at the parade, and he told Adams that he would "make two phone calls" to see if the airplane would be laying over at JFK that night. Id.  Weatherly was at the parade with Barnett, Green, and Watson, but Small was not there. Tr. at 356.  Weatherly then called O.J. Lilly, his girlfriend's brother, to get Small's telephone number.  Id. at 364.  Weatherly told Lilly that Small should call him.  Government's Ex. T-4. Weatherly testified at trial that Small was a "workaholic" who he thought might be working on a holiday.  Tr. at 356.  A few minutes later, Lilly called Weatherly to tell him that Small thought he was trying to reach Watson.  Government's Ex. T-5.  Weatherly and Small finally spoke.  Government's Ex. T-6.  Small was not working, but he did "know the schedule for that thing there."  Id. at 2.  He informed Weatherly that the unidentified flight was not "overnighting."  Id.  Weatherly explained that "something is there" and told Small that if he were at work, "what I gave you the other day, I would double it."  Id. at 3.  Small said that it was a "bust because I'm not working today."  Id.  Weatherly explained that no one would find "it" unless the "little cats" came.  Id.  Weatherly said that he would "let it go back and let them hold on to it" and asked when the flight was going to "overnight" at JFK.  Id. at 4.  Small asked whether "it" was "in anything," but Weatherly did not want to discuss that issue on the telephone.  Id.  Small then asked whether it was going to "take another ride," and Weatherly confirmed that it would.  Id.  Weatherly testified at trial that he was talking to Small about a

narcotics shipment that was stowed on a Universal flight and that customs would not find it unless they brought dogs to inspect the airplane.  Tr. at 367-69.  Weatherly also testified that Small informed him that the airplane would overnight at JFK the following day.  Id. at 369.

Finally, the last piece of evidence relates to the September 20, 2003 cocaine shipment that was seized by customs.  That evening, Weatherly told Adams that his two supervisors had become difficult, asking for "things to share with everybody," after he explained to them that the shipment would arrive on a cargo pallet rather in luggage.  Government's Ex. T-55; Tr. at 402.  Weatherly testified that he was telling Adams that Cleveland Green, Barnett, Watson, and Small, and "especially the supervisors," "want a little bit more . . . they just wanted basically a good share a good cut."  Id. at 401-02.  The government had previously adduced evidence indicating that Barnett and Small were supervisors.  Weatherly testified that he never discussed the shipment with Small after the seizure.  Id. at 380.

At trial, Weatherly testified that, "[i]n the beginning," he had not told the Evergreen crew that he was importing narcotics.  Id. at 427.  Weatherly's testimony was confused as to whether he believed that Small knew that he was involved in narcotics importations.  Id. at 427-436.  While Weatherly testified at trial that Small had known that he was importing narcotics, Weatherly had told law enforcement officers otherwise during proffer sessions.  Id. With respect to the June 20, 2003 shipment, Weatherly testified that "[t]he reason why I paid [Small] is because basically he looked the other way.  He didn't complain when he saw me doing my thing."  Id. at 524.  With respect to the second shipment, which occurred in late June or early July, Weatherly testified that "I paid [Small] because he knew about it."  Id.

The Second Circuit indicated in <u>United States v. Rodriguez</u>, 392 F.3d 539 (2d Cir. 2004), that "[t]o sustain a conspiracy conviction, the government must present some evidence from which it reasonably can be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." <u>Id.</u> at 545 (internal quotation marks and citation omitted). The court further indicated that "[p]roof that the defendant knew that <u>some</u> crime would be committed is not enough." <u>Id.</u> (internal quotation marks and citation omitted) (emphasis in original). Rather, because the conspiracy charge is a specific intent crime, the government was required to establish that Small knowingly and intentionally participated in the importation of narcotics with Weatherly. See <u>id.</u>; <u>United States v. Cruz</u>, 363 F.3d 187, 198 (2d Cir. 2004).

While the case is a close one, given that the court must view the evidence in the light most favorable to the government and draw all reasonable inferences in the government's favor, giving deference to the jury's assessment of credibility, the court must conclude that the government presented sufficient evidence from which the jury could have found that Small knowingly and intentionally participated in the drug importation conspiracy. The court reaches this conclusion viewing the evidence cumulatively.

First, evidence concerning the June 20, 2003 shipment is clearly insufficient to establish either knowledge of the drug importation scheme or participation in it. Weatherly's testimony established, at most, that Small may have seen something suspicious and that Weatherly took the precaution to give him $400 as hush money. Second, while the government presented no evidence that Weatherly discussed the late June or early July shipment with Small, Weatherly testified that he had asked Small to "watch his back" before

13

beginning to unload the airplane, Tr. at 352, and also that he paid Small $1000 on that occasion because "he knew about it." Id. at 524. While the details about Small's knowledge at that point remain imprecise, a reasonable juror could infer at least that Small had agreed to participate in Weatherly's scheme to import some sort of contraband. The September 1, 2003, telephone conversation between Weatherly and Small gives rise to a reasonable inference that Small was aware that Weatherly was importing narcotics. The conversation clearly took place against the background of shared knowledge. Weatherly had only to ask whether Small knew "the schedule for that thing there" for Small to understand what Weatherly meant. Government's Ex. T-6 at 2. Significantly, a reasonable juror could conclude that Small understood Weatherly to be talking about drug-sniffing dogs when he said that no one would find the shipment unless the "little cats" came. Id. at 3. The jury could also reasonably infer knowledge of the scheme from Small's question whether the shipment was "in anything," to which Weatherly replied that he did not want to discuss the issue on the telephone. Id. at 4. Taken cumulatively, the evidence presented thus far indicates, as of September 1, 2003, Small's knowledge of the drug importation scheme and his willingness to participate in it. Viewing Weatherly's testimony about the September 20, 2003 shipment in the light most favorable to the government, Small wanted a more substantial payment for his role in the importation at a point in time when he had knowledge of the nature of the crime that Weatherly wanted him to join in committing and after Weatherly had told him that the shipment would be a large one arriving on a cargo pallet.

Viewed cumulatively, the evidence in the record gives rise to a reasonable inference that Small knew of the specific crime Weatherly was committing and intended to facilitate that

crime. As a result, the court must thus deny Small's motion for acquittal. See United States v. Camejo, 929 F.2d 610, 613 (11th Cir. 1991) (finding the evidence sufficient to convict an airport ramp supervisor of conspiracy to import narcotics where knowledge of the scheme was overwhelming and defendant had accepted "hush money").

III.    Single v. Multiple Conspiracies

Erskine seeks to overturn his conviction under Fed. R. Crim. P. 29 on the basis that the evidence adduced at trial was insufficient in that it did not prove the single conspiracy charged in the indictment but instead showed that there were multiple conspiracies. The multiple conspiracies issue also implicates defendants Green and Small in ways that will be explained below.

To prove a single conspiracy, "the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990). Where a defendant contends that multiple conspiracies were proven at trial, rather than the single conspiracy charged in the indictment, the defendant bears the burden of showing that "no rational trier of fact could have concluded that a single conspiracy existed based on the evidence presented." United States v. Sureff, 15 F.3d 225, 230 (2d Cir. 1994).

It is well established that the question whether the government's proof shows a single conspiracy or multiple conspiracies is one of fact for a properly instructed jury. United States v. Johansen, 56 F.3d 347, 350 (2d Cir. 1995). The jury's verdict will not be disturbed if the evidence, viewed in the light most favorable to the government, "could have led a reasonable juror to conclude beyond a reasonable doubt (1) that the scope of the criminal enterprise

proven fits the pattern of the single conspiracy alleged in the indictment, and (2) that [each] defendant participated in the alleged enterprise with a consciousness of its general nature and extent." United States v. Berger, 224 F.3d 107, 114 (2d Cir. 2004) (quoting United States v. Rosa, 11 F.3d 315, 340 (2d Cir. 1993)).

Even if the proof showed multiple conspiracies, rather than a single one, however, there would be no ground to reverse Erskine's, or any other defendant's, conviction unless he could show that this variance caused him "substantial prejudice," that is, that the variance denied him a fair trial. A conviction will be reversed where the defendant can show that (1) the indictment charged a single conspiracy, but the proof disclosed several independent conspiracies, and (2) defendant was so prejudiced by this variance as to be denied a fair trial. Johansen, 56 F.3d at 350; United States v. Bertolotti 529 F.2d 149, 155 (2d Cir. 1979). In evaluating prejudice in this context, the essential question is whether the jury convicted the defendant "on evidence unrelated to his own alleged activity." United States v. Washington, 48 F.3d 73, 80 (2d Cir. 1995). Stated differently, the question is whether "the evidence proving the conspiracies in which the defendant did not participate prejudiced the case against him in the conspiracy to which he was a party." Johansen, 56 F.3d at 351 (emphasis in original).

A.    Variance

The essence of the crime of conspiracy is the agreement. United States v. Alessi, 638 F.2d 466, 473 (2d Cir. 1980) (citing United States v. Borelli, 336 F.2d 376, 384 (2d Cir. 1964)). As noted above, "in order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." Maldonado-Rivera, 922 F.2d at 963. The government need

not prove that each defendant "knew every other member or was aware of all acts committed in furtherance of" the conspiracy. <u>Alessi</u>, 638 F.2d at 473 (citation omitted). Moreover, "a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations." <u>United States v. Williams</u>, 205 F.3d 23, 33 (2d Cir. 2000) (internal quotation marks and citation omitted). "Finally, a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." <u>Maldonado-Rivera</u>, 922 F.2d at 963. The Second Circuit has indicated that "[a] single conspiracy may be found where there is mutual dependence among the participants, a common aim or purpose or a permissible inference from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." <u>United States v. Vanwort</u>, 887 F.2d 375, 383 (2d Cir. 1989) (citing <u>Bertolotti</u>, 529 F.2d at 154).

"This Circuit has gone quite far in finding single conspiracies in narcotics cases." <u>Bertolotti</u>, 529 F.2d at 154. The court has indicated that "[t]he business of narcotics trafficking falls of necessity into the familiar patter of the so-called chain conspiracy." <u>United States v. Moten</u>, 564 F.2d 620, 624 (2d Cir. 1977). The court has further indicated that "[t]he common thread running through these cases is our treatment of [narcotics trafficking conspiracies] as general, albeit illegal, business ventures" involving a "traditional modus operandi." <u>Bertolotti</u>, 529 F.2d at 154-55. The typical trafficking organization involves "a group of importers or suppliers selling on a regular basis to a core of well-financed middlemen who in turn sell to another group of distributors who eventually sell at retail to the small pusher or addict."

Moten, 564 F.2d at 624. Suffice it to say that the evidence adduced at trial did not clearly establish a typical trafficking conspiracy easily identifiable as a "so-called chain conspiracy" that operated pursuant to this "traditional modus operandi." The court thus does not find the instant case to fall within the foregoing line of case law.

The government has not explicitly invoked one of the common pictorial distinctions in arguing that it has proved the existence of a single conspiracy, simply asserting, it seems, that Adams is the common link that binds the various importation schemes into a single conspiracy. The court finds it at least analytically informative, however, to attempt to understand Adams' importation schemes through this kind of conceptual shorthand. As noted above, the Second Circuit has found the typical narcotics trafficking network to constitute a prototypical chain conspiracy. Courts have acknowledged that such conspiracies do not always involve links that are essential to one another, but rather are often composed of "parallel strands" that are combined into "loosely knit" and "vertically integrated" networks. United States v. Whaley, 830 F.2d 1469, (7th Cir. 1987); United States v. Martino, 664 F.2d 860, 876 (2d Cir. 1981) (citations omitted). The alternative pictorial aid, the "hub and spoke" conspiracy, conceives of a conspiracy with a central, organizing figure, the "hub," who coordinates with various "spoke" conspirators who may or may not have joined in a common conspiracy. As explained by the Supreme Court in Kotteakos v. United States, 328 U.S. 750 (1946), the question is whether there is a "connecting rim" that proves a single rather than multiple conspiracies. Id. at 755. The factors enumerated above, such as the size of the conspiracy and the amount of interdependence and assistance among the various "spokes" inform whether there is such a

"connecting rim."  See United States v. Ness, No. 01 Cr. 699 (AKH), 2003 WL 21804973, *7 (S.D.N.Y. Aug. 6, 2003).

A typical chain conspiracy can be discerned in each of the importation schemes alleged to fall within the conspiracy charged in the indictment, including a foreign supplier, a liaison, an airport organizer, and an offloading crew.  The question, then, is whether a rational trier of fact could have concluded that the various schemes–the Barbados and ITI plans and the Flight 15 importation–were part of the same, loose-knit, vertically integrated network as the core Universal Airways importation scheme, or whether, on an alternate theory, Adams served as the hub where these various "spoke" schemes, that were connected by a "rim," met.

The Barbados plan bears the closest relationship to the core, Universal scheme.  As detailed above, both involved Persaud as the supplier, Browne as the liaison, and Adams as the airport organizer.  While the Universal scheme involved, by necessity, employees of Evergreen Eagle, which serviced Universal flights, the planned Barbados shipments would have arrived on American Airlines flights.  Erskine was Adams' contact at American Airlines.  Viewing the evidence in the light most favorable to the government, it is reasonable to conclude that Erskine was to play a role in these importations substantially similar to that played by Weatherly in the Universal importations.  A rational finder of fact could have concluded that this Barbados scheme was part of the core Universal conspiracy, in that the conspirators were seeking out a new avenue for importing drugs through JFK.  Stated differently, a rational trier of fact could have concluded that the Barbados scheme constituted a "turning of the corner" of the Universal scheme to a new sphere of operation.

The Flight 15 importation of marijuana bears the most tenuous relationship to the core Universal scheme. It also so happens that the strongest evidence of Erskine's involvement in narcotics importation concerns the October 5, 2003 shipment of marijuana on Fight 15. The evidence adduced at trial indicated that Erskine had put Adams in contact with a Jamaican marijuana supplier named Glen. The only reasonable inference from the evidence presented at trial is that, after Adams negotiated with Glen a shipment of seventy kilograms of marijuana to be sent via Flight 15, that shipment was seized on October 5, 2003. Adams discussed the seizure with Erskine and Gladstone Blair, who was named in the indictment but who pled guilty prior to trial.

This importation differs from the core Universal scheme in significant ways. There is a different source country, a different drug, a different supplier, and a different airline. No evidence suggests any commonality between this importation and the Universal importations aside from Michael Adams' involvement. While a central figure in the Universal importations, the evidence adduced at trial hardly suggests that he was the mastermind of that scheme. Viewing the evidence in the light most favorable to the government, the court concludes that no rational trier of fact could find the Flight 15 importation to be part of the same conspiracy as the Universal importations. The differences enumerated above indicate that the two could not reasonably be determined to be part of the same loose-knit, vertically integrated network. Moreover, because a rational juror could not conclude that Adams was the mastermind or centerpiece of either scheme, the two schemes are not part of a "hub and spoke" conspiracy enclosed by a "connecting rim." The best that can be said is that the two, independent

conspiracies shared a common participant, Michael Adams, who apparently sought to involve himself in as many importation schemes at JFK as possible.

Whether any rational finder of fact could conclude that the ITI scheme was part of the overarching conspiracy charged in the indictment is a closer question. As detailed above, the evidence adduced at trial indicated that Estrella, known to Adams as Cancellation, had asked Selwyn Smith whether Adams had a contact in Miami who could divert luggage containing narcotics from the ITI section of the airport to an airplane bound for JFK. After Smith discussed the proposal with Adams, both understanding that Priestly Green could do the job, Smith decided that he no longer wanted to work with Adams. From that point forward, the evidence adduced at trial indicates that Adams recruited Green, an American Airlines employee, to divert bags arriving in Miami to JFK and Erskine, an American employee at JFK, to retrieve the luggage once it had arrived in New York. The only reasonable inference to be drawn from the evidence adduced at trial is that Cancellation was to be the supplier, an inference that gains support from Adams' complaint to Erskine that his "travel agent" for the ITI scheme was not getting any "tickets." Government's Ex. T-41. It bears repeating that Adams had given Estrella the moniker "Cancellation" in light of his many cancelled shipments. This inference is further supported by the government's argument in its rebuttal summation that Adams was complaining to Erskine in this conversation about his supplier's failure to send narcotics via Miami. Tr. at 1513-14.

Considering this evidence, the ITI scheme, like the Flight 15 importation, differs in significant respects from the Universal importations. The supplier was to be Cancellation rather than Persaud; the narcotics were to be routed through Panama or Venezuela rather than

Guyana; the drugs were to arrive on American Airlines flights rather than Universal flights. The only overlap of personnel between the two schemes, aside from Adams, was Priestly Green, who was the Miami contact in the ITI scheme and who had recruited Weatherly to work in the Universal scheme. The relationship between these schemes hardly suggests the existence of either a loosely knit, vertically integrated network or a "hub and spoke" conspiracy. Rather, as with the Flight 15 scheme, the court finds that a rational juror could only conclude that there were distinct conspiracies with similar goals and methods and minimally overlapping strands.

The government cited in its brief United States v. Vanwort, 887 F.2d 375 (2d Cir. 1989), a case about a narcotics importation conspiracy at JFK involving airport workers where the court found a single conspiracy to exist. The court finds that case not to be controlling here. The scheme in Vanwort involved a well-defined group of Brazilian cocaine suppliers who employed two channels to send drugs into the United States, using employees of Pan American World Airways ("Pan Am") and Varig Airlines ("Varig") to achieve their goal. A single distribution chain existed before the narcotics reached JFK, and the supervisors of the smuggling activities at the respective airlines had indicated that they had "counterparts" or "partners" at the other airline. Based on the evidence adduced at trial, the Second Circuit concluded that there was "mutual dependence and assistance" between the two channels, insofar as they shared the same sources, there was an overlap in personnel, and there was evidence of cooperation or a "partnership" among the Pan Am and Varig conspirators. Id. at 383. The court found that the two spheres shared a "common aim or purpose" in that the Brazilian suppliers used them interchangeably and the conspirators at Pan Am and Varig

performed the "same services using the same methods for the same group of Brazilian exporters." Id. at 384. Finally, the court indicated that although the two operations were physically separate, each member was aware of his part in a larger organization. Id. The evidence in Vanwort clearly established the existence of a single importation conspiracy involving "parallel strands" at the airport that were akin to the relationship between the Universal importations and the Barbados plan in the instant case. Nothing in Vanwort, however, persuades the court that the Flight 15 importation or the ITI scheme were similarly part of the same conspiracy.

The jury in the instant case was instructed on single and multiple conspiracies. The court nonetheless finds that no reasonable juror could have concluded, based on the evidence adduced at trial, the existence of the single conspiracy alleged in the indictment. Rather, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in the government's favor, the evidence proved the existence of three conspiracies overlapping to the extent that Michael Adams was involved in each. The evidence also indicated, however, that Michael Erskine played a role in each of the three conspiracies, being a key figure in the Flight 15 importation, the ITI scheme, and the Barbados plan which, as analyzed above, marked a "turning of the corner" of the Universal scheme, the core conspiracy charged in the indictment. Thus, the evidence adduced at trial indicated Erskine's participation in conspiracies to import and to possess with intent to distribute both cocaine and marijuana.

Even though there was a variance between the single conspiracy charged in the indictment and the multiple conspiracies proved at trial, Erskine, as discussed below, did not suffer substantial prejudice. That the court has determined the sole importation scheme

involving marijuana to have been a separate conspiracy from the core conspiracy charged in the indictment raises the specter, however, that Green and Small, who were not alleged to have played any role in the Flight 15 importation, suffered prejudice as a result of the variance in that the jury found their offenses to have involved marijuana.

B.    Substantial Prejudice

Notwithstanding that the evidence adduced at trial proved multiple conspiracies rather than the single conspiracy charged in the indictment, Erskine cannot prove that he suffered prejudice as a result of this variance.  Green and Small only suffered prejudice to the extent that the jury found their offenses to have involved marijuana.  Courts in this circuit consider four factors in determining whether a defendant has shown substantial prejudice: (1) whether the trial court gave a jury charge, pursuant to Pinkerton v. United States, 328 U.S. 640 (1946), allowing the defendant to be convicted for substantive offenses committed by another; (2) whether statements of persons not in a conspiracy with the defendant, but which were directed against him, were received as a co-conspirator's declaration that would otherwise constitute inadmissible hearsay; (3) whether there was a prejudicial "spillover" because of a large number of improperly joined defendants; and (4) whether shocking or inflammatory evidence came in against the defendant.  Johansen, 56 F.3d at 351; United States v. Alessi, 638 F.2d 466, 475 (2d Cir. 1980).

1.    Erskine

In the instant case, there was no Pinkerton charge, which allows one member of a conspiracy to be convicted for substantive crimes if committed by another in furtherance of the conspiracy.  To the contrary, the court instructed the jury that it should consider the evidence

against each defendant individually. Second, the court is aware of no hearsay statements uttered by a member of one of the conspiracies that was used to the detriment of Erskine. See United States v. Carson, 702 F.2d 351, 362-63 (2d Cir. 1983); Alessi, 638 F.2d at 475; United States v. Miley, 513 F.2d 1191, 1208 (2d Cir. 1975) ("[N]either our inquiries from the bench nor our examination of the transcript have disclosed any hearsay emanating from a member of one of the conspiracies that was used to the detriment of a member of another."). To the contrary, because sufficient evidence established Erskine's membership in all three conspiracies, any admitted co-conspirator statements in furtherance of the conspiracy that were directed against Erskine clearly were in furtherance of a conspiracy of which Erskine was a member. Third, there was no prejudicial "spillover effect." The Second Circuit has indicated that "the possibility of prejudice resulting from a variance increases with the number of defendants tried and the number of conspiracies proven." Bertolotti, 529 F.2d at 156. Although twenty-five defendants were indicted, only four were tried together in this case, and the evidence established, at most, three conspiracies. Erskine played a role in all three of them. The number of persons tried together was small enough to enable the jury to give individual consideration to each. See Carson, 702 F.2d at 363 (citing cases). That the trial consumed less than two weeks also indicates that the jury could give each defendant individualized consideration. That the defendants were afforded such consideration (albeit imperfectly, as discussed below) appears from the verdicts. Small was acquitted on one of the two conspiracy counts, conspiring to possess with intent to distribute narcotics. The jury also concluded that while Eglan Younge had conspired to import and to possess with intent to distribute cocaine, he had not conspired to commit either offense with marijuana. Finally, no

"shocking or inflammatory" evidence was introduced against Erskine. Telephone conversations between Erskine and Michael Adams constituted the bulk of the evidence admitted against him. While the government did present to the jury large quantities of cocaine and marijuana that had been seized during the course of its investigation, the crimes of the four defendants were not markedly different. See id. at 363. The Second Circuit has found shocking or inflammatory evidence to have resulted in "substantial prejudice" in limited circumstances, such as where evidence of violence and mob connections was introduced against a defendant who was unrelated to the defendants with respect to whom that evidence was pertinent. Johansen, 56 F.3d at 352.

The courts finds no merit in Erskine's contention that there was a prejudicial variance in the proof of a conspiracy. The court thus denies Erskine's motion for acquittal.

2.    Green and Small

As a preliminary matter, the court notes that it has raised the multiple conspiracies issue with respect to Green and Small sua sponte.[5] See United States v. Pena, 961 F.2d 333 (2d Cir. 1992) (district court had sua sponte ordered acquittal on the conspiracy count pursuant to Fed. R. Crim. P. 29(c) citing insufficient evidence of agreement). The issue is of significance because the court's jury charge, which was agreed to by the parties, directed the jury that in order for it to conclude that the single conspiracy charged in the indictment existed, the government had to have proven beyond a reasonable doubt that two people entered into an

_____

[5]The court understands that it did not invite the parties to brief this issue, and it would be willing to reconsider its determination if any party believes the court overlooked compelling arguments or evidence that was adduced at trial.

agreement to import both cocaine and marijuana.[6] The court charged the jury in this way in order not to undermine Erskine's multiple conspiracies defense. As analyzed above, there was a variance between the multiple conspiracies proved at trial and the single conspiracy that was charged in the indictment.

The jury convicted Green of conspiring to import and possess with intent to distribute narcotics. It convicted Small of conspiring to import narcotics. In response to interrogatories on a special verdict sheet, the jury determined that both defendants' offenses involved cocaine and marijuana. As analyzed above, however, no rational trier of fact could have concluded that the Air Jamaica Flight 15 importation of marijuana was part of any conspiracy in which the government established Green or Small's membership. Furthermore, the court has carefully reviewed the record and is aware of no evidence that would give rise to a reasonable inference that any other scheme alleged to fall within the indictment involved marijuana.[7] As

---

[6]Stated differently, the court charged the existence of the conspiracy conjunctively, i.e., that the jury must find that two people agreed to achieve both objectives of the conspiracy. The court charged joinder in the disjunctive, indicating that the jury could find a defendant guilty of conspiracy if they determined that he joined the conspiracy with the intent of furthering at least one of those objectives and were unanimous as to which objective he intended to further.

[7]Tyrone Browne testified that he had been involved in a number of marijuana importations in the 1990s, which were not charged in the indictment. Tr. at 177-82. He first became involved in cocaine importations, with Persaud as the supplier, in 1998. Id. at 182-83. Browne testified that he was only involved with marijuana at one point after that, in 2002, but that he had simply delivered the drugs to Michael Adams and had not arranged the shipment. Id. at 259-60. Selwyn Smith testified he had only been involved with Adams in the importation of cocaine. Id. at 584. Mark Gauntlett testified about his involvement in several marijuana schemes with Adams, id. at 640-44, but the government has not alleged that these schemes fall within the conspiracy charged in the indictment. Thus, viewing the evidence adduced at trial in the light most favorable to the government, no rational finder of fact could conclude that any of the schemes alleged to fall within the indictment, other than the Air Jamaica Flight 15 scheme, involved marijuana.

analyzed above, there was sufficient evidence from which a rational juror could conclude that Small was involved in the importation of cocaine.  The evidence with respect to Green's involvement in cocaine importations was overwhelming.  The court must consider, however, whether the defendants suffered substantial prejudice from the variance between indictment and proof in that not even one scintilla of evidence established their involvement in any marijuana importation schemes.

As noted above, there was no <u>Pinkerton</u> charge in the instant case, and no shocking or inflammatory evidence came in against the defendants.  With respect to the second and third prongs of the prejudice analysis, however, the court must reach a different conclusion.  The court must conclude, notwithstanding the relatively small number of defendants, that there was prejudicial spillover of evidence concerning the Flight 15 importation and that the jury considered co-conspirator hearsay in furtherance of that conspiracy against Green and Small, who were not members of that conspiracy.  If this were not the case, the jury could not have unanimously responded to the interrogatories on the verdict sheet that Green and Small's offenses involved fifty kilograms or more of marijuana.  Having found that Green and Small suffered substantial prejudice as a result of the variance, the court concludes that it may not properly consider the jury's determination that Green and Small's offenses involved marijuana, as reflected in the verdict sheet, for sentencing purposes.

**CONCLUSION**

For the foregoing reasons, Erskine and Small's motions for acquittal are denied. The court will disregard for sentencing purposes, however, the jury's determination that Green and Small's offenses involved marijuana.

SO ORDERED.

                            _____
                            Allyne R. Ross
                            United States District Judge

Dated: May 27, 2005
       Brooklyn, New York

SERVICE LIST:

Attorney for the United States
Michael Joseph Ramos
U.S. Attorney's Office
147 Pierrepont Street
Brooklyn, NY 11201

Adam Michael Abensohn
U.S. Attorneys Office
147 Pierrepont Street
Brooklyn, NY 11201

Attorney for Defendant Errol Small
Harry Conrad Batchelder, Jr.
Law Offices of Harry C. Batchelder, Jr.
61st Floor
40 Wall Street
New York, NY 10005

Attorney for Defendant Michael Erskine
Barry S. Turner
Barry S. Turner. P.C.
777 Third Avenue (35 Fl.)
New York, NY 10017

Attorney for Defendant Priestly Green
Bernard H. Udell
16 Court Street
Brooklyn, NY 11241