UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
UNITED STATES OF AMERICA,

-against-

MICHAEL ADAMS et al.,

                Defendants.
------------------------------------------------------------- X

03 CR 1368 (ARR)

NOT PRINT
PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

Defendants were convicted of conspiracy charges based on their participation in various schemes at John F. Kennedy International Airport ("JFK Airport") to import narcotics into the United States. The government now seeks a two-level enhancement of defendants' sentences for "abuse of a position of trust" pursuant to § 3B1.3 of the U.S. Sentencing Guidelines.[1] The government contends that the enhancement is warranted because public agencies entrusted defendants—employees with various private companies affiliated with JFK Airport—with security clearances to restricted areas of the airport. In a joint response, defendants object to the application of the "position of trust" enhancement. Defendants argue that the record, in fact, demonstrates that the public agencies involved—the Port Authority of New York and New Jersey ("Port Authority") and Immigration and Customs Enforcement ("ICE") and U.S. Customs and

---

[1] Originally, the government sought the "position of trust" enhancement for the following defendants: Michael Adams, Junior Barnett, Gladstone Blair, Michael Erskine, Cleveland Green, Anthony Gulston, Gary Lall, Robert Lopez, Lloyd McKend, Rafael Rodriguez, Mark Sandy, Errol Small, Selwyn Smith, Stephenson Watson, Erroldo Weatherly, Gladstone Whyte, Michael Williams, and Eglan Younge. At a December 8, 2005 status conference, the government indicated that it had intended to seek the enhancement for all defendants. As explained in further detail in the text, the court declines to apply the enhancement to any of the defendants.

1

Border Protection ("CBP") (collectively, "Customs")—distrusted airport employees regardless of their security status. For the reasons discussed below, the court concludes that the government has failed to meet its burden to establish by a preponderance of the evidence that defendants occupied positions of trust.

## BACKGROUND

By opinion and order dated December 2, 2005, the court held that the record was too sparse to determine by a preponderance of the evidence that the defendants occupied positions of trust by virtue of their employment at JFK Airport. On December 16, 2005, the court held an evidentiary hearing to develop the record as it related to Customs and Port Authority's security clearance procedures at JFK Airport and the supervision, oversight, or monitoring, if any, of airport employees who are granted security clearance. At the hearing, the government presented the testimony of two witnesses. First, Special Agent Fred Wagner of ICE testified about general operations at JFK Airport, the investigation of internal corruption at the airport, and the administration of Customs' security clearance program. (See Hr'g Tr. 7-52, Dec. 16, 2005.)[2] Second, Dennis McCormick, Port Authority's manager of security at JFK Airport, testified about the airport's general operations, the administration of the Port Authority security badge, and the function of law enforcement on the premises. (See Hr'g Tr. 52-100.)

**A. General Operations at JFK Airport**

JFK Airport is a major international airport, located on 5,000 acres of property in Queens County, New York. (Hr'g Tr. 54.) Approximately 100 international and domestic airlines

---

[2] References to the transcript of the hearing held on December 16, 2005 are indicated by "Hr'g Tr." followed by the relevant page number. References to the hearing exhibits are indicated by "Hr'g Ex." followed by the relevant exhibit number.

2

operate at JFK Airport, transporting hundreds of thousands of passengers on roughly 1100 flights per day from 9 active passenger terminals and 90 active airplane gates. (Hr'g Tr. 54-56.) These airlines, along with other private companies affiliated with the airport, employ approximately 45,000 people. (Hr'g Tr. 54.) The number of flights and passengers resulted in a projected 1.8 million tons of cargo, seventy-five percent of which is international, and 95,000 tons of mail distributed through the airport in 2005. (Hr'g Tr. 55.)

The unloading and distribution of baggage, cargo, and mail from international flights is the responsibility of airline employees. (Hr'g Tr. 11.) When an international flight lands, it pulls up to its assigned gate, which is connected by a jetway to the plane. (Hr'g Tr. 8.) The jetway exits to a "sterile" corridor[3] leading to the federal inspection area. (Hr'g Tr. 9.) As international passengers are disembarking through the jetway and the "sterile" corridor, airline employees on the tarmac bring carts to the belly of the plane and unload the baggage and cargo therein. (Hr'g Tr. 9.) The cargo is placed in containers and transferred to carts that are pulled by tugs to airline warehouses. (Hr'g Tr. 9-10.) Baggage, also in containers, is taken to the terminals to be unloaded on conveyor belts for passenger pick-up in the federal inspection area. (Hr'g Tr. 10.) Employees also unload mail from international flights and take it to an airmail facility at the airport. (Hr'g Tr. 11.) Empty containers are kept either at the terminal or at airline facilities located as far as a quarter of a mile from the terminal. (Hr'g Tr. 11.)

**B. Security Clearance Procedures**

---

[3] A "sterile" corridor is a secured route to the federal inspection area, meaning that no person may exit it without a Secured Identification Display Area badge ("SIDA badge") and requisite Customs' clearance. (See Hr'g Tr. 9.) This security precaution ensures that "nothing [from the international flight] has been in contact with any domestic freight or commerce or domestic people" prior to federal inspection. (Hr'g Tr. 9.)

3

Under federal regulations,[4] Port Authority, as an airport operator, must have an "access control program" to restrict access to certain areas of the airport, including the "sterile" corridors, the cargo warehouses, and the tarmac. (Hr'g Tr. 57-58.) Access to these secured areas at JFK Airport requires clearances from both Port Authority and Customs. (Hr'g Tr. 12.) Port Authority issues a Secure Identification Display Area badge ("SIDA badge").[5] (Hr'g Tr. 12, 58-60.) In addition, an employee who works in Customs-secured areas requires Customs' clearance, which is represented by a hologram affixed on the employee's SIDA badge.[6] (Hr'g Tr. 11, 16; see also Gov't Ex. 3.) An employee with SIDA and Customs clearance may obtain entry to certain secured areas—specified by his or her employer and approved by Port Authority and Customs—by "swiping" his or her badge at a door controlled by the computer access control system and entering his or her pin number. (Hr'g Tr. 58-59.) The employee need not swipe his or her badge to exit a secured area. (Hr'g Tr. 59.) There are approximately 1200 entry points requiring badge-swiping and pin entry. (Hr'g Tr. 59.) None of these entry points is manned by personnel. (Hr'g Tr. 72.) Once an employee has entered the secured area, "there is basically no further restriction on [his or her] movement" within that area. (Hr'g Tr. 58.)

---

[4] See 49 C.F.R. § 1542.207 (2005) (governing the requirements for access control systems at airports).

[5] There are two types of SIDA badges: (1) a yellow badge that permits entry into sterile areas of the terminal, the package room, and the cargo warehouse and (2) a red badge that permits entry onto the tarmac. (Hr'g Tr. 58.)

[6] There are three types of holograms, each representing a different level of Customs clearance: Zone 1 clearance permits entry into international flights, the attached jetway, and sterile corridor; Zone 2 clearance permits entry into international flights after passengers disembark, the cargo area of the plane, the baggage belt, and the cargo warehouses; Zone 3 clearance permits access to the Zone 1 and 2 areas. (Hr'g Tr. 14-16.) Defendants had either Zone 1 or Zone 2 access. (Hr'g Tr. 23.)

4

Port Authority issues SIDA badges to the employees of approximately 700 companies who are approved as having "legitimate business needs to operate at the airport." (Hr'g Tr. 62, 72.) Each company designates "issuing officers" who are responsible for identifying employees requiring security clearance. (Hr'g Tr. 62.) Issuing officers attend training about their duties and are instructed that "they are not allowed to issue the card unless the person is on the company's payroll." (Hr'g Tr. 62.) Both the issuing officer and the applicant employee submit forms to Port Authority as part of the application process. (Hr'g Tr. 62.) The forms include the employee's name, home address, date of birth, social security number, physical description, and employment history, and designate the areas at the airport to which the employee needs access.[7] (See Gov't Ex. 2; Hr'g Tr. 65-66.) In addition to completing the forms, the employee must pass a fingerprint-based criminal history record check and provide various forms of identification. (Hr'g Tr. 62-63.) Similarly, to obtain Customs clearance, an employee's company must submit an application with the employee's pedigree information to the Customs Hologram Enforcement Team ("CHASE Team"). (Hr'g Tr. 12-13.) If the employee has been convicted of a crime, he may be disqualified from receiving Customs clearance. (Hr'g Tr. 13.)

Once an employee has completed the application process successfully, he or she must participate in a four hour class to learn about the role of a SIDA cardholder and the regulations governing SIDA clearance. (Hr'g Tr. 67-68.) The employee must pass an exam at the end of the class to obtain the SIDA badge. (Hr'g Tr. 68-69.) Approximately 32,000 employees at JFK Airport have been approved to carry SIDA badges. (Hr'g Tr. 76.) An estimated eighty percent

---

[7] The application also designates whether the employee is given "escort authorization," meaning that the employee is permitted to escort up to five individuals into restricted areas. (Hr'g Tr. 66.)

of all employees at JFK Airport have Customs clearance. (Hr'g Tr. 35.)

## C. Law Enforcement Presence at JFK Airport

At least several government agencies—including Port Authority and Customs (through ICE and CBP)—are responsible for law enforcement at JFK Airport. There are approximately 300 officers, detectives, and supervisors in the Port Authority's police division. (Hr'g Tr. 56.) During any one shift, 60 to 100 persons may be on duty. (Hr'g Tr. 57.) The duties of a Port Authority police officer include traffic control, enforcing the criminal law and vehicle traffic law, and first-responder responsibilities in case of an aircraft fire. (Hr'g Tr. 57.) In addition, Port Authority officers have patrol duties on the tarmac for particular reasons, such as the arrival of high-risk aircraft[8] or high-value cargo, or in particular areas, such as the perimeter. (Hr'g Tr. 92.) Port Authority officers also have general surveillance duties on the tarmac, which require officers to check license plates on vehicles and identification cards. (Hr'g Tr. 93.) Also, "[t]here are patrols that are [on the tarmac] for general reviewing of any activity to ensure safety rules and security rules are being followed." (Hr'g Tr. 93.) Moreover, while Port Authority's security manager testified that he did not know whether his officers conducted surveillance to determine whether there was contraband located on the tarmac (Hr'g Tr. 94), trial testimony indicates that Port Authority officers have conducted such surveillance (See Trial 1 Tr. 867-74, May 2, 2005).[9]

In addition to Port Authority officers, Customs agents are present to examine

---

[8] As an example, Mr. McCormick identified El Al Airlines as a high-risk aircraft to which the Port Authority's Special Weapons Unit would be assigned. (Hr'g Tr. 92.)

[9] References to the transcript of the May 2, 2005 trial of defendants Errol Small, Michael Erskine, Priestly Green, Eglan Younge are indicated by "Trial 1 Tr." followed by the relevant page number. References to the trial exhibits are indicated by "Trial 1, Gov't Ex." followed by the relevant exhibit number.

6

international passengers and baggage in the federal inspection area inside the terminal. (Hr'g Tr. 46-47.) At times, Customs agents also stop airport employees and check their credentials. (Hr'g Tr. 36.) There are also different Customs agents assigned to inspect the cargo. (Hr'g Tr. 47.) These inspections are conducted either in the warehouses or in the planes immediately after landing. (Hr'g Tr. 47.) The purpose of the plane inspections—which may be random or specifically targeted (Hr'g Tr. 50)—is to search for contraband, including narcotics (Hr'g Tr. 48-49).[10] Customs agents will search the plane and examine, or even x-ray, the cargo before airport employees approach the plane. (Hr'g Tr. 49-50.) The plane inspections allow Customs to monitor the activities of employees on the tarmac. (Hr'g Tr. 51.) An estimated thirty percent of Customs' inspections of cargo are plane-side, while the remaining seventy percent are in the warehouses. (Hr'g Tr. 47-49.)

Customs also has an Internal Conspiracy Group ("ICG")—a group of 8 agents (Hr'g Tr. 21)—that is responsible for investigating corrupt airport employees. (Hr'g Tr. 8.) ICG agents receive information from Customs inspectors and then responds to seizures of contraband by "conduct[ing] an investigation to determine who may have placed drugs there or should have been receiving drugs." (Hr'g Tr. 17.) In addition to receiving information from Customs, ICG agents gather information for their investigations by interviewing employees (Hr'g Tr. 17), viewing footage taken from cameras that are placed near the terminal (Hr'g Tr. 18),[11] and

---

[10] In contrast, the inspection of the cargo transported to the warehouses by employees is to enforce trade agreements, quota requirements, or safety regulations. (Hr'g Tr. 48.)

[11] Mr. Wagner testified that the cameras have been vandalized before or the view from the cameras is blocked by cargo or baggage containers. (Hr'g Tr. 18.)

7

reviewing the records of employees' SIDA access (Hr'g Tr. 19-20).[12] At times, ICG agents also conduct physical surveillance "next to a terminal, next to ... an airplane, a gate, near other employees, where they may be working."[13] (Hr'g Tr. 20.) ICG agents spend about twenty percent of their time conducting physical surveillance. (Hr'g Tr. 42.)

In addition to the testimony given at the December 16, 2005 hearing, testimony of trial witnesses establishes law enforcement presence in the restricted areas of JFK Airport. For example, Ron Snyder, a Port Authority police detective, testified that he and another officer were stationed in a white Chevy Suburban on the tarmac monitoring inbound flight activity. (Trial 1 Tr. 868-69.) Specifically, he testified that he observed the offloading of the luggage from a flight from Guyana and, at a Customs agent direction, more closely inspected a tug that was pulling three containers from the aircraft. (Trial 1 Tr. 869-70.) After following the tug and its operator to a storage area, Snyder looked into the containers and found a black bag inside one of them. Snyder stopped the tug operator and asked him for his identification. (Trial 1 Tr. 871-72.) Subsequently, the bag was opened and a package of narcotics was found inside. (Trial 1 Tr. 874.)

Defendants were also aware of the presence of Customs agents on the tarmac conducting plane-side searches. For example, defendant Erroldo Weatherly testified that his role in the conspiracy required that he "study the flights, meaning look and see how many times Customs comes per week, and what exactly they did, if they brought a dog." (Trial 1 Tr. 344.) Weatherly

---

[12] Mr. Wagner also testified that the records of employee entry into secured areas based on SIDA badge access is "very inaccurate." (Hr'g Tr. 20.)

[13] According to Mr. Wagner, physical surveillance is not a "usual method" because they use vehicles that ensure that "it's widely known that law enforcement is present." (Hr'g Tr. 20.)

8

gathered this information to inform defendant Michael Adams of the best times to send narcotics shipments to avoid detection by Customs agents. (Trial 1 Tr. 345.) In spite of the attempt to avoid detection, Customs agents were "all over" the flights that resulted in a July 2003 and September 2003 seizures of narcotics. (See Trial 1 Tr. 355, 377.) In fact, the trial record is replete with references to defendants' concerns about the heavy presence of Customs agents on the tarmac. (See, e.g., Trial 1, Gov't Ex. T-40 at 6 ("That shit is too hot!"); Trial 1, Gov't Ex. T-46 at 2 ("Too much fire," "[T]hem boys is out at the barbecues galore, eh?"); Trial 2, Gov't Ex. 2R at 2 ("[T]hat's too hot boss.").)[14] However, there is also testimony indicating that defendants were able to retrieve narcotics from inbound flights when Customs agents were inspecting the planes. (See Trial 1 Tr. 764-65, 788 (testimony of defendant Junior Barnett explaining that Weatherly successfully retrieved two bricks of cocaine from an inbound flight in the presence of several Customs agents who were apparently "distracted").)

Defendants also testified about the need to change their techniques to avoid detection by Customs. For example, Barnett explained that defendant Eglan Younge had a plan to transport cocaine shipments with the mail to the postal facility because neither Port Authority police nor Customs agents conduct a thorough inspection of the delivery vehicles. (See Trial 1 Tr. 796-97.) Moreover, defendants testified that they were aware of Customs' investigatory techniques and acted with caution as a result. For example, Weatherly testified that in situations involving a potential seizure, Customs agents "pull everybody['s] I.D. who is in the vicinity, double check,

---

[14] As the government explained, "too much fire" refers to the "presence of law enforcement at the scene." (Gov't Affirmation in Support of Arrest Warrants ¶ 72.) At trial, defendant Michael Williams explained that "too hot" means that employees involved in the scheme were "not going to take any narcotics off that flight anymore" due to law enforcement surveillance of the flight. (Trial 2 Tr. 424.)

9

and stuff like that." (Trial 1 Tr. 377.)[15] In a September 27, 2003 phone conversation between defendants Gary Lall and Mark Sandy, Lall noted that Customs agents had taken away the cell phones of all the employees near the location of the September 2003 seizure. (Trial 2, Gov't Ex. 1U, May 31, 2005.)[16] Neither Lall nor Sandy were involved in the September 2003 conspiracy, but Lall discussed the incident as a warning Sandy to "learn from other people's mistakes." (Trial 2, Gov't Ex. 1U.)

## DISCUSSION

The government seeks to increase defendants' base offense level by two levels for "abuse of a position of trust" pursuant to § 3B1.3 of the Sentencing Guidelines. The government argues

---

[15] With regard to the September 2003 shipment, Weatherly testified that he had called in sick to work that day only to receive a call from Adams about the shipment afterwards. (Trial 1 Tr. 374.) Weatherly returned to work to direct his co-conspirators to retrieve the shipment. However, he testified he hid in a warehouse bathroom to avoid running into his manager, who was in the warehouse at the time, because he feared his presence at work would be questioned after he had called in sick. (Trial 1 Tr. 375; see also Trial 1 Tr. 765-66, 770 (testimony of Barnett corroborating Weatherly's story).) This testimony suggests that the schedules of airport employees were monitored by their direct supervisors.

While the government's argument is limited to the relationship between public agencies and the airport employees with security clearances, the court notes that the supervisory role of companies at JFK Airport is relevant because it implicitly and explicitly is part of the security scheme established by Customs and Port Authority. Customs and Port Authority assume that private companies servicing JFK Airport are responsible for the supervision of their own employees. (Hr'g Tr. 29, 31, 73.) Moreover, the companies are explicit partners in the CHASE and SIDA programs as each employer must file applications on behalf of their employees for their employees to obtain the relevant security clearances. (Hr'g Tr. 12-13, 62.) Thus, the companies act as intermediaries between the employees and Customs and Port Authority, and any supervision or monitoring of the employees by the companies is relevant to the court's inquiry.

[16] References to the exhibits of the May 31, 2005 trial of defendants Gary Lall, Anthony Gulston, Richard Pitcher, Rafael Rodriguez are indicated by "Trial 2, Gov't. Ex." followed by the relevant exhibit number. Transcript references are indicated by "Trial 2 Tr." followed by the relevant page number.

that defendants occupied public positions of trust because Port Authority and Customs granted defendants security clearances after a rigorous application process and such clearances allowed defendants to freely access sensitive areas of the airport with effectively no supervision or oversight. Defendants contend that application of § 3B1.3 is unwarranted because defendants' positions lacked the discretionary capacity required to satisfy the definition of a "position of trust" under the Sentencing Guidelines. After reviewing the record, the court concludes that the government has not established by a preponderance of the evidence that defendants, in their positions as airport employees with Port Authority and Customs security clearances, occupied "positions of trust."

The Sentencing Guidelines direct the court to increase a defendant's base offense level by two levels "[i]f the defendant abused a position of public or private trust, or used a special skill,[17] in a manner that significantly facilitated the commission or concealment of the offense." U.S. Sentencing Guidelines Manual § 3B1.3 (2004). The commentary explains that "'public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." Id. § 3B1.3 n.1. The commentary further explains that "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." Id. Moreover, "the position of public or private trust must have contributed in some significant way to the commission or

---

[17] The commentary explains that a "'special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S. Sentencing Guidelines § 3B1.3 n.3. The government does not claim that defendants possessed a "special skill."

11

concealment of the offense." Id.

Thus, the court must undertake a two-prong analysis to find that the "position of trust" enhancement is warranted. See United States v. Nuzzo, 385 F.3d 109, 115 (2d Cir. 2004). First, the court must determine that the defendant occupied a position of trust. Id. Whether the defendant occupied a position of trust must be viewed from the perspective of the victim. See United States v. Thorn, 317 F.3d 107, 120 (2d Cir. 2003). The primary inquiry to determine whether a person is in a position of trust is "'the extent to which the position provides the freedom to commit a difficult-to-detect wrong.'" See United States v. Allen, 201 F.3d 163, 166 (2d Cir. 2000) (quoting United States v. Viola, 35 F.3d 37, 45 (2d Cir. 1994)). The Second Circuit has repeatedly emphasized that "this standard requires that the 'defendant's position must involve discretionary authority ... [and that] this discretion must have been entrusted to the defendant by the victim." United States v. Thorn, 317 F.3d 107, 120 (2d Cir. 2003) (quoting United States v. Hirsch, 239 F.3d 221, 227 (2d Cir. 2001)). Second, the court must find that the defendant violated that trust in a way that significantly contributed to the crime at issue. Nuzzo, 385 F.3d at 115. The government must meet its burden of proving satisfaction of both prongs by a preponderance of the evidence. See United States v. DeSimone, 119 F.3d 217, 228 (2d Cir. 1997).

Here, the government argues that "[t]he security clearance provided by Port Authority and Customs through the SIDA program imbues an employee with the authority to enter, leave and roam about restricted areas of JFK Airport at their own discretion with little or no supervision." (Gov't Brief at 7.) In support of this rather sweeping argument that all airport employees with SIDA badges occupy positions of trust, the government claims that the rigorous nature of its

12

security clearance process signifies the high level of trust it confers upon airport employees. (Gov't Brief at 8.) In fact, however, the record demonstrates that the security clearance procedures mandated by Customs and Port Authority are minimal. Issuing officers at the 700 companies approved to conduct business at JFK Airport are merely told that applicants for SIDA badges must be "person[s] ... on the company's payroll." (Hr'g Tr. 62.) Applicants must provide basic information (i.e., name, address, social security number, and employment history), several forms of identification, submit to a criminal history record check, and complete a four hour training session. (Hr'g Tr. 12-13, 62-63, 65-68.) None of these requirements signify that the security application process is more rigorous than the application process for any other employment position. The primary disqualifying factor—an applicant's criminal history (See Hr'g Tr. 13, 62-63)—is a disqualifying factor for position with most employers, be it in the private or public sector. The other disqualifying factor is the applicant's failure to attend a four hour training session about the role and responsibilities of a SIDA badge holder and achieve a score of eighty or higher on a written test of the subject matter. (Hr'g Tr. 68-69.) The government, however, provides few, if any, details about the content of the training session. (See Hr'g Tr. 67-68; 82-83). Thus, the government has provided no support for its statement that applicants are required to complete "a rigorous training program." (Gov't Brief at 8.) Moreover, the sheer number of employees at JFK Airport with SIDA badges and Customs holograms supports the conclusion that the security clearance procedures are not as rigorous as the government claims. Approximately 32,000 employees at JFK Airport have SIDA badges (Hr'g Tr. 76) and an estimated eighty percent of all employees at JFK Airport have Customs clearance (Hr'g Tr. 35). The court, therefore, concludes that the record simply does not support the

government's argument that "[the security clearance] application process ... is engineered to identify trustworthy individuals" (Gov't Brief at 8).

The government also argues that airport employees with security clearances are in positions of trust because it is difficult, if not impossible, to effectively supervise and monitor airport employees due to the size and operational design of JFK Airport. (Gov't Brief at 7-8.) The government contends that its inability "to accomplish the herculean feat of monitoring the activities of 35,000 airport employees spread out over th[e] vast landscape [of JFK Airport]" suggests that defendants were trusted in the sense that they had the "freedom to commit a difficult-to-detect wrong." (Gov't Brief at 8 (quoting United States v. Castagnet, 936 F.2d 57, 62 (2d Cir. 1991)). In other words, the government asks the court to infer public trust of airport employees from the fact that the Customs and Port Authority simply could not "be everywhere to monitor everything" (Gov't Brief at 8).

The court has no doubt that the task of overseeing the 32,000 employees with security clearances at JFK Airport is complex and, at times, overwhelming. The record, however, demonstrates that the government has a multi-faceted system in place to monitor the activities of airport employees on the tarmac. In addition to surveillance cameras placed near the terminals (Hr'g Tr. 18), Port Authority and Customs conduct physical surveillance of the tarmac. Port Authority officers have patrol duties, which include general surveillance to ensure that safety and security rules are being followed. (Hr'g Tr. 93.) Moreover, in this case, Port Authority officers conducted surveillance to determine whether narcotics shipments were being transported by airport employees. (See Trial 1 Tr. 867-74.) Customs agents are also assigned to search baggage and cargo in the plane and in the warehouses. (Hr'g Tr. 47.) More importantly, an estimated

thirty percent of inspections are conducted inside the planes. (Hr'g Tr. 47-49.) The only reasonable explanation for these plane-side searches is that Customs agents want to inspect potential narcotics shipments <u>before</u> corrupt airport employees approach the plane. At trial, defendants testified that they were aware of Port Authority and Customs' surveillance of employee activities on the tarmac. (See, e.g., Trial 1 Tr. 344-45.) While the court's inquiry must be made from the perspective of the victim, defendants' testimony is relevant because it clearly supports the fact that monitoring of airport employees was frequent. In addition to Port Authority and Customs' surveillance, ICG also plays a role in monitoring airport employees by conducting investigations of airport employees, which may include physical surveillance of the tarmac, in response to Customs' seizures. (Hr'g Tr. 17-20.) Although ICG's role in the government's policing scheme is reactive, the preemptive surveillance conducted by Customs agents and Port Authority officers establishes that airport employees, in spite of their security clearances, were not trusted to freely access the tarmac and other secured areas of JFK Airport.

The court notes that the government places great weight on the fact that its surveillance techniques are ineffective. The government specifically claims that "the monitoring of employees at JFK Airport is anything but rigorous" and, therefore, the only plausible conclusion is that "employees are trusted by the Port Authority and Customs to do their jobs and nothing else." (Gov't Reply Brief at 3.) The government's argument is meritless for two reasons. First, the record fails to demonstrate that Customs and Port Authority's surveillance methods were ineffective. As discussed above, the record shows that both agencies conducted frequent surveillance of employees on the tarmac and successfully seized narcotics on some occasions. Second and more importantly, the court is doubtful that the effectiveness of the government's

15

surveillance methods is relevant to the "position of trust" inquiry. The Second Circuit has held that simply because "[defendant's] illegal activities frustrated ... oversight by corrupting various checks on his performance does not mean that he held a position that his victims intended to be immune from oversight and control; indeed, it appears that he held a position with certain checks in place to confirm his compliance with the law ..., but that his illegal actions undermined these checks." Thorn, 317 F.3d at 122; see also United States v. Viola, 35 F.3d 37, 45 (2d Cir. 1994). Similarly, even assuming that the government's assertion is true, the ineffectiveness of oversight at JFK Airport is irrelevant and simply supports the fact that JFK airport employees are not in positions of trust.

For the foregoing reasons, the court concludes that the government has failed to satisfy its burden of establishing by a preponderance of the evidence that airport employees with security clearances at JFK Airport occupy positions of trust under § 3B1.3 of the Guidelines. The court, therefore, need not determine whether the government satisfied the second prong of the inquiry. Consequently, the court declines to apply the "position of trust" enhancement in calculating defendants' sentences under the now non-mandatory Sentencing Guidelines.

SO ORDERED.

_____
Allyne R. Ross
United States District Judge

Dated: January 30, 2006
       Brooklyn, New York